[Civ. No. 4488.   Third Appellate District.—November 10, 1932.]

J. A. LEWIS et al., Respondents, v. H. G. McCLURE et al., Defendants; A. BLOOMBERG et al., Appellants.

440

White, Miller, Needham, Harber & Mering, and Johnson & Lemmon for Appellants.

Chester F. Gannon and Ralph H. Lewis for Respondents.

THOMPSON (R. L.), J.—This suit was brought for damages for fraud alleged to have been exercised in procuring an exchange of properties. The plaintiffs secured a verdict against all of the defendants. A judgment was rendered accordingly. From this judgment several of the defendants have appealed. The McClures failed to appeal and the judgment against them has become final.

The plaintiffs are husband and wife. They owned a lot in Chico upon which a store building and gas station were

constructed. This property was valued at $15,000, and was subject to a mortgage for $2,800. The grocery-store and gas station were operated by the plaintiffs. Their stock of merchandise was worth $3,500. They also owned ten acres of land near Lakeview, Oregon, valued at $500. The brothers, A. Bloomberg and L. Bloomberg, own the Anchor Hotel situated on J Street in Sacramento. They value this property at $150,000. The defendants, H. G. and Gladys F. McClure, held a ten-year lease on the hotel property, which expired February 1, 1940. The rent of the hotel was fixed at $1200 a month. The McClures owned the furniture and equipment of the hotel, which were subject to a chattel mortgage to secure an indebtedness of $2,025 held by the defendant, Klein Realty Service, Inc., a corporation. This indebtedness was due and a foreclosure suit was threatened by the mortgagee. The hotel business was not prosperous. The lessees were in default in the payment of rent. Mr. and Mrs. McClure also owned certain apartments on E Street in Sacramento valued at $5,500. This property was subject to a mortgage of $2,800.

In April, 1930, a representative of the McClures visited plaintiffs at Chico and proposed an exchange of properties. This agent succeeded in interesting the plaintiffs in the project. He invited them to inspect the Anchor Hotel at Sacramento to discuss the proposed exchange with the McClures. The following Sunday, April 13th, the plaintiffs went to Sacramento, where they met H. G. McClure and were shown some of the rooms of the hotel. McClure related to them an exaggerated and glowing tale of the prosperity of the business. He said the hotel business was worth $30,000 and that he was making a profit of $500 a month from the enterprise. He also told them of the E Street apartments which he owned subject to mortgage, and of the hotel furniture which he owned subject to a chattel mortgage of $2,500. He offered to exchange the hotel business and Sacramento apartments subject to their respective mortgages for the Chico and Lakeview properties belonging to the plaintiff, free of encumbrance. Several hours were consumed in this interview. Assuming that an agreement of exchange would be reached, McClure called upon the telephone Mr. Hall, who was a salesman in the employ of the Klein Realty Service Corporation, and requested him to come directly to the

Anchor Hotel and prepare an agreement of exchange. This instrument was promptly drawn by Mr. Hall as directed by McClure, and subsequently presented to Mr. and Mrs. Lewis for their signatures. This document provided for delivery of possession of the properties on the following Wednesday. The plaintiffs deny that they had agreed upon specific terms of an exchange, or that they knew the contents of the instrument. They did, however, sign the document. They then returned to their home at Chico.

The following Wednesday Mr. Lewis went to Sacramento and again interviewed Mr. McClure. He then declined to carry out the agreement to exchange properties. He was dissatisfied with some of the terms of the written document. He discovered by visiting the attorneys who represented the Bloombergs that the mortgage on the hotel furniture, which was held by the Klein Realty Service Corporation, was but $2,025 instead of $2,500, as the agreement recited. Mr. Lewis insisted on interviewing the owners of the hotel to obtain from them an assurance of procuring an assignment of the lease in the event of an exchange of properties. He sought to obtain permission from the owners to alter the hotel front to install a cigar stand therein. Mr. A. Bloomberg came to the hotel and discussed the proposed exchange of properties with Lewis. During this conversation, A. Bloomberg made to J. A. Lewis some of the alleged false representations regarding the hotel business upon which this suit for damages is founded. McClure then told Mr. Lewis the hotel business was worth $45,000; that it was a prosperous business and a regular mint in which to make money. He said the rooms were constantly rented; that many of them yielded double rent for the reason that forty-five of them were occupied by railroad men who slept in the daytime. He assured Lewis that about ninety guests were regularly registered at the hotel each day; that the income from the hotel was $2,800 a month or about $100 a day, and that he derived a net profit of $500 a month. The respondents claim these statements were false and that they were thereby induced to exchange properties to their damage. There is substantial proof to indicate that the value of the hotel business and the value of the rent were greatly exaggerated. The business was operated at a loss. The income amounted to only half the sum represented by McClure. The hotel

was patronized by only about half the number of guests he claimed were registered therein.

In discussing the proposed exchange of properties with A. Bloomberg on the 16th of April, Lewis told him what McClure had said regarding the business. Bloomberg substantially confirmed the statement of McClure by saying he was surprised he did not make more profit than was claimed, for they had lately purchased the property for $150,000, after making a complete investigation and that the hotel was a perfect mint in which to make money. He also assured Lewis the sum of $1200 a month was not exorbitant rent "when you are making money", adding that the hotel was a great place to make money. Bloomberg insisted on the payment of $2,025 in cash to satisfy the chattel mortgage held by the realty company, as a prerequisite to assigning the lease.

On the occasion of the visit of Mr. Lewis to the Anchor Hotel on April 16th, Carl A. Klein, who is a member of the Klein Realty Service Corporation, was called upon and directed by McClure to prepare the second contract of exchange. Mr. Lewis told him that he did not intend to "go ahead with the deal" on the terms which were incorporated in the original agreement. Mr. Klein then said: "You are making a mistake; you are offered an awful good proposition here; we have information that hotel is a good business, we know it sold for over $45,000. . . . It is one of the best leading hotels, best businesses in Sacramento. . . . It is a strictly man's hotel. I never saw anything like it. The thing has been running full all the time. It is just a mint. If you would like to go into the hotel business you cannot be mistaken." This was a substantial confirmation of what Lewis had been told by McClure. Klein also told Lewis the chattel mortgage which his company held would have to be paid. In view of the statements made to Mr. Lewis by McClure, this assurance on the part of Klein tended strongly to induce the plaintiffs to make the exchange. It does appear that McClure, Bloomberg and Klein actively co-operated in procuring the exchange of properties. When the exchange was consummated the Bloomberg brothers and the realty company divided the money which was paid by Lewis on the chattel mortgage, notwithstanding the fact that this

sum appeared to be an indebtedness due to the realty company.

Relying upon these statements of McClure, Bloomberg and Klein, the plaintiffs again consented to make the proposed exchange of properties upon terms, some of which were radically different from those which were incorporated in the original contract. A new agreement was thereupon prepared for the contracting parties by Mr. Klein according to the terms which were finally adopted. This new contract was ultimately signed by Mr. and Mrs. McClure, and by Mr. and Mrs. Lewis. It provided for an immediate transfer of possession of the properties. The new contract was not complete in itself. It is necessary to construe it with the original contract in order to ascertain the entire terms of the transaction. In effect, it is a mere modification of the original contract. It is, however, true that except for the modifications which were adopted in this second document, the exchange would not have been consummated. It follows that these false representations which became the inducement for this final modified contract constitute actionable fraud.

This final contract was dated and executed April 16th. The necessary deeds of conveyances to the respective properties were executed. Klein Realty Service Corporation executed a release of their chattel mortgage. An assignment of the ten-year lease of the Anchor Hotel was made to J. A. and Anna E. Lewis and accepted by both A. and L. Bloomberg in the following language: "We hereby accept the assignment of the said lease from H. G. McClure and Gladys F. McClure, his wife, to J. A. Lewis and Anna E. Lewis, his wife." By agreement the documents necessary to consummate the exchange of properties were deposited with a Chico bank to be delivered pursuant to written instructions. The plaintiffs borrowed sufficient money to satisfy the chattel mortgage. It was paid to the bank, as directed, in two checks. One was drawn in favor of the Bloombergs for the sum of $1200. This check was indorsed and cashed by them. The other check was drawn in favor of Klein Realty Service Corporation for the sum of $825. This check was indorsed and cashed by that realty company.

The plaintiffs took immediate possession of the hotel and operated it for a period of time. They soon discovered they had been grossly defrauded. Their income from that source

did not exceed $1450 a month. They registered not more than half the customers they were assured the hotel possessed. Their operating expenses aggregated $2,300 a month. They sustained a loss of approximately $850 a month. A rescission of the contract of exchange was demanded. This was refused. This suit for damages was then instituted. A jury returned a verdict of $10,000 in favor of the plaintiffs and against all the defendants. A joint and several judgment was accordingly rendered. All defendants, except H. G. and Gladys F. McClure, have appealed from this judgment. The judgment against the McClures therefore became final.

The appellants contend the judgment is not supported by the evidence for the reasons that: (1) The fraudulent representations upon which the plaintiffs rely were made after they had consented to the exchange of properties, as evidenced by the original contract; (2) no fraudulent representations were personally made to Anna E. Lewis, one of the joint purchasers and coplaintiffs, and the conveyances of her interest in the properties were therefore not made in reliance upon such alleged fraud; (3) since the judgment is void as to the interest of Anna E. Lewis therein, it is void *in toto* because it is impossible to determine what proportion thereof her coplaintiff, J. A. Lewis, is entitled to recover; (4) L. Bloomberg insists there is no evidence that he participated in the negotiations for an exchange, and that he is not bound by the alleged misrepresentations made by his brother, A. Bloomberg; (5) all appellants assert the language alleged to have been used by them constitutes mere expressions of opinion and is not actionable fraud.

We are of the opinion the judgment is valid against each of the defendants. The record discloses a conflict regarding the alleged false representations. There are circumstances from which it satisfactorily appears all of the defendants knew the negotiations for an exchange of properties were conducted with J. A. Lewis and Anna E. Lewis as husband and wife, in the consummation of which Mr. Lewis acted as the agent for his wife. The cause was tried on this theory. Both spouses were parties to the contracts of exchange and to the necessary instruments of conveyance. The Anchor Hotel property was transferred to both plaintiffs. The assignment of lease was made to both of

them. Each of the defendants profited by the exchange of properties. A. Bloomberg and L. Bloomberg jointly owned the Anchor Hotel. Both signed the acceptance of the assignment of lease to Mr. and Mrs. Lewis. A. Bloomberg acted as the agent for his brother, L. Bloomberg. The Bloombergs shared in the $2,025 paid by the plaintiffs as a part consideration for the exchange. The Klein Realty Service Corporation obtained the balance of this sum. The realty company and the Bloombergs insisted on the payment of this sum in cash as a part of the transaction. They divided the proceeds between themselves, notwithstanding the fact that this money was secured by a chattel mortgage on the hotel furniture executed in the name of the realty company. Mr. Klein, in behalf of his realty company, was active in drawing the papers and helping to procure the exchange. The false representations were made before the final contract was executed. This document contained essential terms except for which the exchange would not have been consummated. It is immaterial that a previous contract was executed which was adopted as a part of the final agreement, and which might have been specifically enforced, except for the presence of fraud. The action is not based upon the original contract alone. Before the exchange was consummated and pending the negotiations therefor, the false representations were made. Mr. Lewis testified that the exchange would have been abandoned except for the acceptance of the terms expressed in the latter instrument. He said: ''I told them (the McClures) . . . I did not care to go ahead with the deal, that I could not go through with it that way. . . . That I would come back to Sacramento and let them know what I could do.'' Mr. Klein, who appeared as an agent and member of the Klein Realty Service, Inc., then responded: ''You are making a mistake; you are offered an awful good proposition here; we have information that hotel is a good business, we know it sold for over $45,000. . . . It is one of the best leading hotels, best businesses in Sacramento. . . . It is a strictly man's hotel. I never saw anything like it. The thing has been running full all the time. It is just a mint. If you would like to go into the hotel business you cannot be mistaken.'' The plaintiffs relied on these representations and were induced thereby to make the exchange. Mr. Lewis

so testified. Under such circumstances the defendants are jointly liable for the damages resulting from the fraud.

■ Where a husband and wife are induced to exchange properties with a third person by means of fraudulent representations made to the husband who was known to be acting as agent for his wife with respect to her interest therein, it is unnecessary to prove that the false representations were also made to her personally. (Sec. 2332, Civ. Code; *Benner* v. *Hooper*, 112 Cal. App. 53 [296 Pac. 660]; *Hamilton* v. *French*, 78 Cal. App. 289 [248 Pac. 281].) Section 2332, *supra*, provides: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

In 26 C. J. 1121, section 47, it is said: "It is not necessary that representations should have been made directly to the complainant, as recovery can be had for representations made to another with the intent or knowledge that they should or would be repeated to complainant."

In 27 C. J. 5, section 116, it is said: "One cannot sue for false representations unless they were made to him with intent that he should act thereon, or were made under such circumstances that the speaker must reasonably have anticipated that plaintiff would hear and act upon them."

In the case of *Spadoni* v. *Maggenti*, 121 Cal. App. 147 [8 Pac. (2d) 874, 878], wherein a husband and wife were similarly defrauded in an exchange of properties, the court said: "Under the circumstances of this case, it is immaterial whether false representations were made to only one of the plaintiffs without communicating them to the other party. Fraud perpetrated upon either one of joint purchasers of property may warrant a rescission of the conveyance thereof."

In the case of *Hunter* v. *McKenzie*, 197 Cal. 176 [239 Pac. 1090, 1094], it was held that the necessary assumption that a wife relied upon false representations which were made to her husband alone, as an inducement for an exchange of properties, could be inferred from the circumstances of the case. It was there held to be unnecessary to prove by direct evidence that she did make the exchange relying upon the false representations. The court said: "The fact of reliance upon alleged false representations may be inferred from

the circumstances attending the transaction which often-times afford much stronger and more satisfactory evidence of the inducement which prompted the party defrauded to enter into the contract than his direct testimony to the same effect.''

The record in the present case seems conclusive of the fact that all of the defendants knew the plaintiffs were hus-band and wife and that J. A. Lewis acted as agent for his wife in negotiating the exchange of properties. The evi-dence shows they dealt with them as such. It was therefore unnecessary to prove that the false representations were com-municated to her. The circumstances indicate that she relied upon these representations in making the exchange of prop-erties.

Mr. A. Bloomberg also made false representations to the plaintiff J. A. Lewis regarding the hotel business which were relied upon by the plaintiffs as inducements for making the exchange of properties, and which created a liability for damages against himself and his brother, L. Bloomberg. The Bloombergs own the Anchor Hotel. They had executed a ten-year lease of the hotel property to the McClures for a rental of $1200 a month. The lessees were in default in the payment of their rent. The hotel was being operated at a loss. The Klein Realty Service Corporation held a chat-tel mortgage on the hotel furniture to secure the payment of $2,025. The jurors were entitled to assume from the fact that this sum of money was paid by the plaintiffs and divided between the realty company and the Bloombergs that both of these parties were interested in encouraging the exchanging of properties. All the appellants profited by the exchange. In a conversation which occurred between Mr. Lewis and A. Bloomberg pending the negotiations for the exchange of properties, Lewis related the statement previ-ously made to him by Mr. McClure to the effect that the business was a great success and was worth $30,000; that he had some ninety guests constantly registered; that the regular income was $2,800 a month and that he realized a net profit of $500 a month. Mr. A. Bloomberg said: ''Is that all he is making there? . . . I am surprised he is not making any more than that. . . . This is a good business here. We have known it for a good many years.'' In reply to the question from Mr. Lewis, ''I understand you have

just bought the property?", Bloomberg replied: "Yes, . . . (it is worth) $150,000." Inquiring about the rent, Mr. Lewis asked, "Isn't $1,200 an enormous amount of money (for rental)?" Bloomberg replied, "Why, no, if you are making money. This hotel is just a mint to make money. We just recently bought the property, and we went into all the details, and knew what we were doing before we bought it." Mr. Bloomberg also assured Lewis that the rent had all been paid. This statement of Mr. Bloomberg's was in the nature of an assurance that all McClure had said to Lewis was true. It is reinforced with the positive declaration that they had fully investigated the hotel business before they purchased it for $150,000, and "we knew what we were doing before we bought it". He added the guaranty that "this hotel is just a mint to make money". These statements amount to an assurance on the part of Bloomberg that Lewis was entitled to believe all that was related to him by McClure.

The record contains sufficient facts to indicate that Carl A. Klein acted as the agent for his Klein Realty Service Corporation in helping to procure the exchange of properties. It also sufficiently appears that A. Bloomberg and L. Bloomberg were jointly interested in the hotel enterprise, and that A. Bloomberg acted as the agent for his brother in helping to procure the exchange of properties. All of these appellants profited by the transaction.

The law is well established that when an agent acting within his actual or apparent authority procures the execution of a contract or the exchange of properties by means of fraud, the principal is liable for damages incurred thereby, even though the principal is innocent of personally participating in the fraud, when he accepts and retains benefits which accrue from the transaction. In the present case it appears that each of the appellants did profit by the exchange of properties and that sufficient evidence of the agencies of the parties who personally participated in the alleged fraud, is shown.

In 2 Pomeroy's Equity Jurisprudence, page 1887, section 909, it is said: "When an agent, in doing the business of his principal, and acting within the scope of the (actual or apparent) authority conferred upon him, makes fraudulent representations or concealments, . . . the principal is liable

in the same manner, to the same extent, and for the same remedies as though the fraud were committed by himself personally; . . . (even though) the principal is personally innocent of any fraud, . . . if the principal receives and retains the proceeds of the agent's fraud. . . . The only mode in which the principal, under these circumstances, can escape liability, is by repudiating the acts of his agent, and refusing to accept or retain any benefit of the transaction, immediately upon his discovery of the fraud."

Support of this principle is also found in 2 Mechem on Agency, page 1348, section 1776, and in the same volume at page 1548, section 1984. The same doctrine is announced in *Hamilton* v. *French*, 78 Cal. App. 289 [248 Pac. 281], and in *Benner* v. *Hooper*, 112 Cal. App. 53, at page 63 [296 Pac. 660, 664]. In the authority last cited the court says: "Upon both principle and authority an agent's knowledge is imputed to his principal (Sec. 2332, Civ. Code; 1 Cal. Jur. 847), and the principal is charged with the fraud of his agent committed in the course of his employment and in the interest of the principal. (12 Cal. Jur. 775; *Powell* v. *Oak Ridge Co.*, 84 Cal. App. 714, 719 [258 Pac. 636].) This rule is uniformly applied when the principal is shown to have accepted and retained the benefits of the agent's fraudulent act."

Prejudicial error is assigned in giving to the jury the following instruction: "In an action for damages resulting from acts of conspirators, each participant in the wrongful act are responsible as joint tort feasors for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor, and regardless of the degree of his activity. And so is the plaintiff here entitled to a joint recovery of damages against such defendants as he can show united or co-operated in inflicting a wrong upon him, if any of them there be (who) did so unite or co-operate."

While it is true that a conspiracy between the defendants was not alleged, and that it was not sufficiently proved, the giving of the foregoing instruction is harmless. The gist of the action is the procuring of the exchange of properties by means of alleged false representations on the part of each of the defendants. This is the purport of the allegations of the complaint. A joint and several judgment was rendered against each of the defendants. The verdict of the

jury is based upon an implied finding that each defendant is guilty of the false representations with which he is charged. There is a sharp conflict of evidence respecting the charge of fraud against the several appellants. We have, however, held this judgment is sufficiently supported by evidence to bind each of the appellants and his principal for separately exercising fraud which procured the exchange of properties. The support of the judgment therefore does not depend upon proof of a conspiracy between them. The plaintiffs are entitled to judgment against each of the defendants shown to have participated in the fraud. (*More* v. *Finger*, 128 Cal. 313 [60 Pac. 933]; *Blair* v. *Guarantee Title Co.*, 103 Cal. App. 260, 270 [284 Pac. 719]; *McPhetridge* v. *Smith*, 101 Cal. App. 122 [281 Pac. 419].) Assuming that the challenged instruction was erroneously given because a conspiracy was neither alleged nor sufficiently proved, it was not prejudicial. The error is cured by the provisions of article VI, section 4½, of the Constitution.

The judgment is affirmed.

Pullen, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 10, 1932, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 9, 1933.